DOMINICK FOTI AND VICENZINA SOTTILARO, PLAIN-TIFFS-APPELLANTS, v. PAUL HELLER, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 25, 1957—Decided December 13, 1957.

Conford, J. A. D., dissented in part.

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Virgil J. Lanni* argued the cause for appellants.

*Mr. Louis Gluck* argued the cause for respondent.

The opinion of the court was delivered by
GOLDMANN, S. J. A. D. Plaintiff tenants appeal from a county district court judgment in favor of defendant landlord in an action under *N. J. S.* 2A:42–38, as amended, to

recover treble damages for alleged rental overcharges during the 18-month period, November 1955 through April 1957.

At the trial the following facts were either stipulated or established without contradiction: Defendant purchased a two-story property at 415 45th Street, Union City, in 1951 for $15,000. At that time, and up to July 1955, the premises consisted of a store on the first floor with three rooms in the rear, and a six-room apartment on the second floor. The registered rental for the apartment was $60.50 per month. Between July 1 and November 1, 1955 defendant reconstructed the second floor by adding a room to the rear, installing a kitchen and bathroom in the front portion (we were told this was done by converting the front of the hall-way running the length of the second floor), physically separating the rear four rooms from the front three, and completely renovating and modernizing both apartments. This resulted in the creation of two distinct, self-sustaining apartments on the second floor, in place of the six-room apartment, the former occupying a greater area than the latter. The cost was $5,200.

After the completion of this work, and shortly before November 1, 1955, defendant rented the front apartment to plaintiff Foti at a monthly rental of $55, and the rear one to plaintiff Sottilaro for $65. They regularly paid these rentals up to March 1, 1957. Having ascertained that the registered rental of the former six-room apartment was $60.50 a month and that no decontrol order had been obtained from the Union City Rent Director, plaintiffs in March, and again in April 1957, together tendered $60.50 to defendant as their total rent. He refused the tenders and instituted disposses proceedings in the county district court, where judgment went against the tenants. They paid the $55 and $65 rents for March and April, and appealed from the judgments for possession. While that appeal was pending they quit the premises.

The treble damage action ended in defendant's favor, the district court judge holding that the premises rented to plaintiffs were not the same as those previously registered

with the local rent control board because they were "so completely changed in identity and composition from the original single 6 room premises." In his view, to allow plaintiffs to recover the $3,213 demanded (treble damages based on an overcharge of $59.50 a month for 18 months) "would result in not only unjust enrichment to the plaintiffs but in an unconscionable and intolerable result never contemplated by the treble damage statute." He further noted that in any event there could be no recovery for the period July 1956 to April 1957, inclusive, because the 1953 Rent Control Act (*L.* 1953, *c.* 216; *N. J. S.* 2*A*:42–14 *et seq.,* as amended), which authorized treble damage suits, had expired on June 30, 1956. The subsequent permissive rent control statute, *L.* 1956, *c.* 146, adopted in Union City by ordinance on September 20, 1956, expressly granted to it the right to provide, by ordinance, for rent control violations. *Section* 6; *N. J. S.* 2*A*:42–61. The September 20, 1956 ordinance contains no treble damage or other penalty provision; the only such provision, the court observed, was to be found in a prior rent control ordinance, adopted in June 1956, wherein penalties for violations were provided by way of fine and imprisonment. These penalties were the only ones the municipality could impose; it was without express legislative authority, and therefore beyond its power, to provide for treble damage suits and vest jurisdiction thereof in the district court.

Plaintiffs argue that the rents they had paid were in violation of the rent control laws and the rules and regulations adopted thereunder, absent a decontrol order obtained by the landlord. Defendant had, in fact, obtained no such order from the Union City Rent Director until March 18, 1957, effective March 28, 1957. Plaintiffs rely upon the following provision of the Union City Rent Control Ordinance dated August 15, 1956:

"ARTICLE II — DECONTROLLED HOUSING SPACE

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) Additional housing units created by a conversion on and after April 23, 1954, involving structural changes in *particular housing*

*space* by substantial alterations and remodelling and resulting in self-contained family units; Provided, however, that such housing space shall continue to be under control until after application on notice, an order of decontrol has been entered by the Director, after a determination." (Italics ours)

This provision, they say, was passed pursuant to *L.* 1956, *c.* 146, *sec.* 12 (*N. J. S.* 2*A*:42–67), which states:

"Decontrols from rent control shall be provided for by any such ordinance so adopted in the same manner and to the same extent as they were provided for as of June 30, 1956, by the State Rent Control Act [*L.* 1953, *c.* 216; *N. J. S.* 2*A*:42–14 to 55, as amended] and by the rules and regulations made and promulgated thereunder, and the said provisions for such decontrol shall be deemed to be applicable whether specifically included in any such ordinance or not so included."

They contend there could be no automatic decontrol; housing space continued under control until a decontrol order was entered, and they quote from the *Revised Rent Control Rules and Regulations* (June 15, 1955) of the State Rent Control Director, adopted pursuant to the 1953 act, as amended:

"PART II — CONTROLLED HOUSING SPACE
ARTICLE 1 — EXCEPTED OR DECONTROLLED HOUSING SPACE
\*        \*        \*        \*        \*        \*        \*        \*
2. GENERAL EXCEPTIONS—Pursuant to the Act, the following additional housing space shall be totally excepted under the conditions hereinafter set forth:
\*        \*        \*        \*        \*        \*        \*        \*
(d) Additional housing space created by conversion involving structural changes *in particular housing space* by substantial alterations or remodeling.
\*        \*        \*        \*        \*        \*        \*        \*
(2) at any time after April 23, 1954, where such conversion resulted in additional self-contained family units of a type for which there is a shortage in the area or sub-area; provided that such housing space shall continue to be subject to control until an order of decontrol has been entered, after a determination, pursuant to the regulations." (Italics ours)

Union City, as has been indicated, was one of the municipalities which took advantage of the Rent Control Act of

1956 (*L. 1956, c.* 146; *N. J. S.* 2A:42–56 to 73). See, particularly, *L. 1956, c.* 146, *sec.* 13; *N. J. S.* 2A:42–68. The act provided that the governing body of any municipality wherein rent control was in effect and operation on June 30, 1956, and which theretofore petitioned the Legislature to pass a special law authorizing it to adopt rent control ordinances, could make, amend, repeal and enforce ordinances to provide for the regulation of rentals and the possession of premises and units used for dwelling purposes in such municipality which were subject to rent control on June 30, 1956. *L. 1956, c.* 146, *sec.* 1; *N. J. S.* 2A:42–56. The adoption of such ordinances, upon a finding that a public emergency existed within the municipality due to a housing shortage adversely affecting the health, safety and general welfare of the inhabitants, was to be deemed to be for the purpose of regulating rent control in the municipality in a manner similar to the rent control provided therein by the Rent Control Act of 1953 (*L. 1953, c.* 216, as amended and supplemented; *N. J. S.* 2A:42–14 to 55) and the rules and regulations promulgated by the State Rent Control Director pursuant to that act as the same were in effect and operation in the municipality on June 30, 1956. See *In re Freygang,* 46 *N. J. Super.* 14 (*App. Div.* 1957), affirmed 25 *N. J.* 357 (December 9, 1957).

The entire structure of our rent control legislation of recent years and the state and local rules and regulations promulgated thereunder center upon and are geared to rent control of a *particular housing space.* As defined in the Rent Control Act of 1953 (*L. 1953, c.* 216, *sec.* 1; *N. J. S.* 2A:42–14, as amended), housing space means "any building or structure, or any part thereof * * * rented or offered for rent for living or dwelling purposes, together with all privileges, services, furnishings, furniture, equipment, facilities and improvements connected with the use or occupancy of such property, but not including * * * (c) additional dwelling units created by new construction subsequent to August 1, 1953; or (d) dwelling units which have not at any time been rented during the period July 1, 1942 to

August 1, 1953, inclusive; \* \* \*." *Section 7* of the 1953 act (*N. J. S. 2A*:42–20, as amended) authorizes the State Rent Control Director to promulgate, amend, repeal and enforce such reasonable rules and regulations as may be necessary "to control rents, housing space and practices relating to the recovery of possession thereof," and "to effectuate gradual decontrol of such housing space consistent with supply and demand for such housing space." *Section 13* (*N. J. S. 2A*:42–26) makes it unlawful, regardless of any contract, lease or other obligation, "to demand or receive any rent for housing space in excess of the lawful base rent established or fixed for such housing space under this act, as adjusted by any rule or regulation of the State Rent Control Director, or by an order of a county rent control agency, or by a county rent control board of review," in any municipality wherein rent control is in operation under the act. And *section 19* of the 1953 act, as amended by *L. 1954, c. 260, sec. 7* (*N. J. S. 2A*:42–32) states:

"For the purposes of this act, lawful rentals for housing space payable as of July 31, 1953, *for premises then in existence* shall be deemed the lawful base rentals for such housing space, for premises not rented on July 31, 1953, the amount of the lawful base rental for such housing space shall be the rental lawfully payable therefor on the date such premises were heretofore last rented prior thereto ; *or, if not so rented, the rent lawfully payable as of the date of the first rental subsequent thereto.*" (Italics ours)

In the *Revised Rent Control Rules and Regulations* promulgated by the State Rent Control Director on June 15, 1955, and which were in force and effect at the inception of plaintiffs' tenancies, appear the following provisions:

"PART II — CONTROLLED HOUSING SPACE

\*   \*   \*   \*   \*   \*   \*   \*

ARTICLE II — CONTROLLED MUNICIPALITIES — LAWFUL BASE RENT — DWELLING SPACE

\*   \*   \*   \*   \*   \*   \*

2. LAWFUL BASE RENT.—It is hereby declared that the lawful base rent for housing space is the rent actually and legally charged, received, payable or due for such housing space for the rental period ending on midnight, July 31, 1953, or the last rental period

immediately prior thereto, and for space not rented on July 31, 1953, the date on which such premises were heretofore last rented prior thereto; *and if not so rented, the rent actually and legally charged, received, payable or due as of the date of the first rental subsequent thereto.*

\*     \*     \*     \*     \*     \*     \*     \*

3. FIRST RENTAL \* \* \*—*First rental of housing space shall mean the date on which all of the space included in particular housing space was first rented to a tenant under Federal or State rent control.* \* \* \*"   (Italics ours)

The statute and the State Rent Control Director's rules and regulations legally adopted pursuant thereto, are controlling. These prior rent control measures were continued in municipalities which took advantage of the Rent Control Act of 1956. *L. 1956, c. 146, sec. 7; N. J. S. 2A:42–62.* When they speak of "housing space" the reference is to a specific area. It is clear and uncontrovertible that the two apartments respectively occupied by plaintiff tenants are the result of substantial remodeling and alteration. They are entirely different from the original six-room apartment. These separate and distinct dwelling facilities occupy a space larger than the former apartment—a room had been added in the rear, and the front hallway used to create a new bathroom and kitchen. Both apartments are complete and self-contained living accommodations. They had been fully renovated prior to plaintiffs taking possession. All this, as indicated, had been done at a substantial cost, the landlord having expended $5,200, or more than one-third his initial investment in the entire two-story building, in constructing the additions, reconversion and modernization.

The two apartments so created were, in the language of the *Revised Rent Control Rules and Regulations* of the State Rent Control Director, *Part II, Art. 1, sec. 2(d),* quoted above, "additional housing space created by conversion, involving structural changes," but not *"in* particular housing space." This is not a case, often encountered, of a landlord taking a particular space and, by alterations or remodeling *within* the four walls of that space, creating two

or more smaller living units in place of the one that originally existed. A common example of this is where the owner of a spacious older-type dwelling, who initially rented each floor to a separate tenant, decided to divide each floor into two or more bachelor apartments, fitting them within the original walls of the respective floors. Although defendant here did use the six rooms constituting the original "particular housing space," he not only made substantial structural changes within that space, but added new space to it, and then completely rearranged, divided and renovated the whole so as to achieve two modern apartment units.

These new housing accommodations had no previous rental history as three- and four-room apartments under the registration data then on file with the appropriate rent control agencies. They constituted new rental units. The first rental charge to the plaintiffs individually for these newly created apartments became the maximum legal rental for the units under *N. J. S.* 2A:42–32 and the rules and regulations of the State Rent Control Director (*Part* II, *Art.* II, *pars.* 2 and 3, quoted above). *Cf. Weiderman v. Recklinghausen,* 278 *App. Div.* 289, 105 *N. Y. S. 2d* 513 (*App. Div.* 1951), affirmed 303 *N. Y.* 633, 101 *N. E. 2d* 705 (*Ct. App.* 1951); *De Jesus v. Greenland Holding Corp.,* 122 *N. Y. S. 2d* 857 (*Sup. Ct. App. Term* 1953), affirmed 282 *App. Div.* 1025, 126 *N. Y. S. 2d* 888 (*App. Div.* 1953); see also *Winwood v. Sturgeon,* 100 *Ohio App.* 251, 136 *N. E. 2d* 137 (*Ct. App.* 1955); and *cf.* also *Scerbo v. Condro,* 44 *N. J. Super.* 355 (*Cty. D. Ct.* 1957). Plaintiffs willingly took the apartments at the $65 and $55 rentals in November 1955, and having paid the rentals and occupied the units without complaint for almost a year and a half, now belatedly seek the windfall of treble damages. We consider their position fundamentally unjust.

No argument has been made of excessive rental charges or of gouging by defendant in his dealings with plaintiffs. The purpose of our rent control acts has always been to stabilize rentals in emergency areas and to prevent extortionate increases resulting from housing shortages, and at

the same time to allow landlords a fair and equitable return upon their investment. *Friedman v. Podell,* 21 *N. J.* 100, 104 (1956).

The question of decontrol is not involved in view of our determination that the apartments rented to plaintiffs were not the same "housing space" registered with the rent control agency at some time in the past, and the rental of the apartments to the respective plaintiffs on and after November 1, 1955 was a "first rental" under the statute and the applicable rules and regulations adopted pursuant thereto. Defendant's action in obtaining a decontrol order in March 1957 is therefore without significance.

The judgment is affirmed.

CONFORD, J. A. D. (dissenting in part). I agree with the majority insofar as the opinion denies the right to treble damages for rental overcharges accruing on or after July 1, 1956. As to the rentals exacted from the plaintiffs prior to that date I am satisfied that these were in excess of what was lawful under the Rent Control Act of 1953 and its subsequent extensions and the implementing regulations of the State Rent Control Director, and that recovery of treble damages therefor appropriately apportioned between the plaintiffs should be allowed.

As I read the opinion of my brethren it holds that once particular housing space previously controlled under the act as a housing unit is converted or rearranged for rental purposes by a process which involves the use of some new added physical space, the landlord is automatically permitted to charge any rental he chooses and this becomes the new lawful base rental without prior administrative approval. And this eventuates notwithstanding that, as in the present case, the new housing accommodations are constituted, to the extent of about 85%, by the particular housing space theretofore under control. In my judgment this result is prohibited by the regulations, except under conditions referred to hereinafter and not met in this case, and is contrary to the basic policy of the act.

This case is controlled by the statute and regulations as they stood between July and November 1955, when the alteration of the apartment was effected, and when plaintiffs became tenants, not by the provisions of the Union City Rent Control Ordinance adopted in 1956 pursuant to the Rent Control Act of 1956. The here material portion of the regulations adopted by the State Rent Control Director on June 15, 1955, is set forth in the majority opinion. This regulation is not contended to be "plainly and palpably inconsistent with the statute" and it must therefore be accorded recognition as part and parcel of the legislative regulatory scheme. *Grenewicz v. Ligham,* 34 *N. J. Super.* 1, 9 (*App. Div.* 1955). The regulation provides that "the following additional housing space shall be totally excepted *under the conditions hereinafter set forth."* (Emphasis added) The crucial classification is (d). This reads:

"Additional housing space created by conversion *involving* structural changes in particular housing space by substantial alterations or remodelling." (Emphasis added)

However, even in a (d) situation there must be compliance with subparagraph (2) under (d), (2) specifying that the conversion must result in additional self-contained family units of a type for which there is a shortage in the area, and there then follows a proviso that "such housing space shall continue to be subject to control until an order of decontrol has been entered, after a determination, pursuant to the regulations."

The key words in (d) are "additional" and "involving." The inescapable literal import of the paragraph is that where the totality of additional or new housing space, whether or not it consists in part of space not theretofore in existence, either physically or as regulated housing space, is created by a conversion, not *of* but merely *involving* structural changes in *particular* housing space by substantial alterations or remodelling, we have a case of eligibility for decontrol, *provided* the additional conditions set forth in subparagraph (2) are met.

Applying the language to the present situation, we find that the two apartments with which we are here concerned were created by conversion which did involve structural changes in the particular housing space constituted by the six-room apartment previously under control, through substantial alterations or remodelling. It follows, therefore, that the two new apartments which resulted from the conversion operation are within the literal ambit of the regulation which was in effect at the time the work of conversion was undertaken and the letting to the present tenants took place. The additional units qualified for decontrol, but decontrol was not automatic. Control continued until the administrative agency made the order and determination specified in (d)(2). Such a determination and order were not made until long after July 1, 1956.

In my opinion, the foregoing literal reading of the regulation comports with clear basic rent control policy. Where there is a conversion and remodelling involving existing housing space with the result that there are more self-contained family units than previously, we have two results, one possibly inimical to rent control objectives, and the other favorable. The harmful possibility is that rents may be increased without a proportionately increased amount of investment, so that, in effect, essentially the same space is paying a higher rent. The temptation of converting to evade the intent and policy of the act is always present. From this standpoint the fact that the conversion operation involves the furnishing of some additional physical space is not material. On the other hand, public policy may be served by conversions where the result is accommodations for more families. The regulations determine that the second indicated policy objective will control, provided the additional dwelling units are of a type for which there is a shortage in the particular area. The determination of that fact is reserved to the rent control agency and therefore the conversion does not automatically remove the property from rent control but must await an order of decontrol in which the administrative authority will not only make the

findings requisite under (2) but also determine whether what has happened constitutes a satisfaction of (d). Additionally, there is the desirable condition that at any given time anyone interested in the property, whether as owner, tenant or prospective new tenant, can be informed by the rent control agency as to the specific rent control status of the property. To hold that a conversion of space plainly within the foregoing regulation is effective to terminate the existing lawful base rental and allow the landlord to create a new one at whatever rent he can command in the market, is largely to frustrate the intent and purpose of the regulation, as just outlined.

Other provisions of the regulations adopted by the State Director make it clear that that official did not regard an increase in the physical space of a housing accommodation rented to a particular tenant as automatically decontrolling the rental unit or permitting the charging of a higher rental without agency authorization. Article V, dealing with "Adjustments in Rents," allows an increase when the landlord and tenant by written agreement agree to a "substantial increase in dwelling space" (V, 9(f)); excepts from a regulation concerning the permissible amount of increases during a specific period cases of "increase of space * * * with the consent of the tenant" (V, 8(c)); and provides for the issuance of a "prior opinion" (advance administrative consent) fixing increased rents "when the landlord seeks to increase the space, services," etc. If the view of the majority as to the basic intent of the statute were sound, landlords would not have to make such applications for rental increases where there was an increase of space in a rental unit comprising particular housing space.

The New York cases cited by the majority are not applicable here. We are controlled by our own statute and regulations, which, unlike those which apparently governed the New York courts, do not make continuity of identity of particular housing accommodations a determinative criterion of automatic decontrol or of a change in lawful base rental.

Under our statute, what is directly controlled is housing space, not housing accommodations, except indirectly.

I conclude that the lawful base rental for these apartments continued, through the month of June 1956 and thereafter until March 28, 1957, to be the registered rental of $60.50 which was in effect prior to the conversion, and that the receipt of rent in excess of that amount was unlawful and subject to the statutory sanction of an action of this kind.