305 So.2d 764 (1974)
CITY OF MIAMI BEACH, a Florida Municipal Corporation, Appellant,
v.
FORTE TOWERS, INC., a Florida Corporation, Appellee.
No. 44936.
Supreme Court of Florida.
October 9, 1974.
Rehearings Denied January 27, 1975.
Robert L. Shevin, Atty. Gen., J. Robert Olian, Asst. Atty. Gen., Joseph A. Wanick, City Atty. Yale Freeman, Asst. City Atty., Tobias Simon of Tobias Simon and Elizabeth duFresne, Miami, and Jack Sobell, for appellant.
Wm. Snow Frates, Ray H. Pearson, James D. Little and Andrew C. Hall of Frates, Floyd, Pearson, Stewart, Proenza & Richman, Miami, for appellee.
*765 Ralph A. Marsicano, Tampa, and Burton M. Michaels, Tallahassee, for Fla. League of Cities, Inc., as amicus curiae.
Marion E. Sibley of Sibley, Giblin, Levenson & Ward, Miami Beach, for amicus curiae.
PER CURIAM.
Jurisdiction of this direct appeal from the Circuit Court of Dade County vests under Art. V, § 3(b)(1), Fla. Const., the trial court having expressly held unconstitutional F.S. § 166.021 relating to municipal home rule (a portion of Ch. 73-129, Laws of Florida, 1973).
It is the unanimous opinion of this Court that F.S. § 166.021 is constitutionally valid, as more fully set forth in the special concurring opinion of Mr. Justice Dekle. A majority of this Court also concurs in the trial court's holding that insufficient evidence was presented at trial to overcome the city council's finding that an emergency existed (at the time it was passed) to support enactment of the rent control ordinance at that time, although Justices Roberts and Boyd expressly dissent on this point.
However, a majority of this Court holds that this particular rent control ordinance is constitutionally defective in its attempted delegation of the legislative powers of the city to the rent control administrator without prescribing sufficient objective guidelines, as is more fully set forth in Mr. Justice Dekle's specially concurring opinion, with which (on this point) Justices Roberts, Boyd and Overton join.
Accordingly, the opinion of the trial court is reversed insofar as it holds F.S. § 166.021 to be unconstitutional and holds that Ch. 73-129 does not authorize the city to enact a rent control ordinance; to the extent that the trial court found the provisions of the ordinance to be invalid as to guidelines and standards, it is affirmed.
Affirmed in part; reversed in part.
DEKLE, J., concurring specially with opinion with which OVERTON, J., concurs.
OVERTON, J., concurring specially with opinion.
ROBERTS, J., concurring in part and dissenting in part with opinion with which BOYD, J., concurs.
ERVIN, J., concurring in part and dissenting in part with opinion with which ADKINS, C.J., and McCAIN, J., concur.
DEKLE, Justice (concurring specially):
Following the enactment of Ch. 73-129, also known as the Municipal Home Rule Powers Act, the City of Miami Beach (hereafter referred to as "the city") adopted a rent control ordinance which included a finding of public emergency due to a housing shortage and abnormal rent increases. Thereafter, the instant suit was filed seeking a declaratory judgment and injunctive relief on the ground that the rent control ordinance was invalid for numerous reasons. Following trial, the circuit court held F.S. § 166.021 invalid to the extent that it authorized municipal rent control laws, and struck down the ordinance on the basis that it conflicted with certain general laws of the state and that it unlawfully delegated the city's legislative authority without establishing sufficient guidelines. The able trial judge also effectively settled certain issues when he specifically ruled that insufficient evidence had been presented, (1) to overcome the city council's finding that an emergency existed, (2) to establish that the ordinance was improperly enacted, (3) to establish that the ordinance was ambiguous, and (4) to establish that the ordinance was discriminatory.
This is not the initial appearance of a rent control ordinance before this Court. We dealt with a prior rent control ordinance of the city in City of Miami Beach *766 v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla. 1972); there we affirmed a trial court order invalidating that ordinance. In so doing, we stated that a municipality has no power to enact a rent control ordinance "absent a legislative enactment authorizing the exercise of such a power by a municipality"; that the ordinance then under consideration contained provisions amounting to an unlawful delegation of the legislative authority of the city without appropriate guidelines, and that the ordinance then in question conflicted with certain general laws regulating landlord and tenant relationships.
First, therefore, we must consider whether the municipality now has the power to enact such an ordinance; that is, whether the enactment of Ch. 73-129 after our decision in Fleetwood Hotel necessitates a change in the result there reached. I believe that it does, and that municipalities now are empowered to enact such ordinances by virtue of new Ch. 73-129.
Ch. 73-129 is a broad grant of power to municipalities in recognition and implementation of the provisions of Art. VIII, § 2(b), Fla. Const.[1] It should be so construed as to effectuate that purpose where possible.[2] It provides, in new F.S. § 166.021(1), that municipalities shall have the governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services; it further enables them to exercise any power for municipal services, except when expressly prohibited by law.
Appellee contends that the broad definition of municipal purposes contained in Ch. 73-129 does not grant the city the power to enact rent control ordinances, since the determination of what constitutes a proper municipal purpose is for the judiciary. City of Miami Beach v. Seacoast Towers-Miami Beach, Inc., 156 So.2d 528 (Fla. App.3d 1963). This argument misses the mark. It is not the definition of municipal purposes found in new F.S. § 166.021(2) that grants power to the municipality to enact such an ordinance, but rather the provision of new F.S. § 166.021(1) which expressly empowers municipalities to "exercise any power for municipal purposes, except when expressly prohibited by law." As we noted in In re Apportionment Law, 281 So.2d 484 (Fla. 1973), the intent of this chapter was largely to eliminate the "local bill evil" by implementing the provisions of Art. VIII, § 2, Fla. Const. The power to enact rent control ordinances in appropriate circumstances is contained in new F.S. § 165.021(1), and is not dependent upon the definitional provision of new F.S. § 166.021(2).
If we must deal with an application of "municipal purposes" in F.S. § 166.021(2) under appellee's challenge and determine whether rent control constitutes a proper municipal purpose, then it presents no judicial problem, for rent control under appropriate circumstances clearly falls within the general category of "municipal purposes." Such a finding has ample support in the authorities. The question apparently has never been determined before in this state, but there is authority for the enactment of rent control ordinances in appropriate circumstances as a proper municipal purpose in Warren v. City of Philadelphia, 382 Pa. 380, 115 A.2d 218 (1955); Inganamort v. Borough of Fort Lee, 120 N.J. Super. 286, 293 A.2d 720 (1972); McQuillen or Municipal Corporations, § 24.563(d).
The enactment of rent control ordinances, given sufficient justifying conditions, *767 is a proper municipal purpose. It is not "expressly prohibited by law" and therefore comes within the grant of power contained in new F.S. § 166.021(1). We need not, therefore, reach the general question of overbroadness of the definitional portion of the act at § 166.021(2).
That the power to enact rent control laws was intended to be included in the broad grant of power to municipalities in Ch. 73-129 can be seen from the legislature's rejection of a proposed amendment to Ch. 73-129 during debate which would have expressly excluded the power to enact such ordinances from the broad grant of power contained in that chapter. Additionally, note the conclusion of the Attorney General in his Opinion 073-267 that Ch. 73-129 empowers a municipality to enact rent control ordinances. I conclude that it was the legislative intent to include in this broad grant of powers the power to enact rent control ordinances in appropriate circumstances, thereby providing the missing authority required by Fleetwood Hotel.
The trial court also ruled that Ch. 73-129 is invalid in that it attempts unlawfully to delegate the State's legislative power to deal in matters reserved to the State, including landlord-tenant relationships and the regulation of decedents' estates. In so doing, the trial court failed to apply the rule that statutes will be so construed as to uphold their constitutional validity whenever possible.[3] And here the statute may be upheld, for F.S. § 166.021(3)(c) expressly excludes from the grant of power to municipalities "any subject expressly preempted to state or county government by the constitution or by general law." Thus, even if a rent control ordinance which was passed under the authority of Ch. 73-129 should seek to regulate such a matter preempted by the State, it would be invalid to that extent under the terms of the authorizing statute itself. While a provision of that nature would require the invalidating of such a provision of the statute, it does not necessitate or even justify a finding that the total statute is invalid.
It has also been contended that Ch. 73-129 is inapplicable to Miami Beach due to the provisions of Art. VIII, § 6(e), Fla. Const., and F.S., § 166.021(3)(d), which exempt from the broad grant of powers any subject preempted to a county pursuant to a county charter adopted under authority of Art. VIII, § 6(e). That constitutional provision states that all provisions of the Metropolitan Dade County Home Rule Charter shall be valid if authorized under Art. VIII, § 11 of our constitution of 1885, and that Art. VIII, § 11, of the former constitution (the Dade County Home Rule Charter provision), shall remain in full force and effect as if Art. VIII of the new constitution had not been adopted. It is contended that the only method by which the power to enact rent control ordinances may be conferred on a municipality in Dade County is by amendment to the municipal charter, as provided in § 5.03 of the County Charter.
It is true that § 5.03 provides the only way in which a city charter may be amended in Dade County. Andrews v. Linden, 284 So.2d 398 (Fla.App.3d 1973). But amendment to the city charter is not the only means by which additional powers may be conferred on a Dade County municipality. The Metro County Charter § 5.02 provides that each municipality shall have the authority to exercise all powers relating to its local affairs not inconsistent with the charter. Section 5.01 reserves the right of municipal self-determination except as otherwise provided by the charter. So long as the additional power does not conflict with the provisions of the charter  and the power to enact rent control ordinances does not so conflict  there is no reason why the Legislature may not confer such additional power on a Dade County municipality. Nor has the power to control *768 rents been preempted by Dade County pursuant to its charter, so as to bring into play the exemption provision of new F.S. § 166.021(3)(d). Accordingly, I conclude that Ch. 73-129, at least insofar as it allows municipalities to enact rent control ordinances, is applicable to municipalities in Dade County.
Having determined that Ch. 73-129 is not an improper delegation of the State's legislative authority, that it provides the legislative authorization to enact rent control ordinances lacking in Fleetwood Hotel, and that its provisions are applicable, insofar as they authorize enactment of rent control ordinances to municipalities in Dade County, despite the provisions of new F.S. § 166.021(3)(d), now let us turn to the validity of the ordinance itself. The trial court found the ordinance invalid both for unlawful delegation of the city's legislative authority without sufficient objective guidelines and for conflict with the Florida Residential Landlord and Tenant Act (specifically, F.S. §§ 83.46, 83.57, 83.58, and 83.59) and F.S. Ch. 731 (Florida Probate Law).
I too find difficulty with the guidelines set forth in the ordinance, both on the question of whether it is by its fixed terms confiscatory and therefore unconstitutional in its results, and also on the charge that the ordinance is arbitrary and unreasonable and therefore unconstitutional.[4] Each aspect of the ordinance in question must be reviewed to determine whether or not it rationally attempts to relieve the critical shortage of residential housing and accommodations which justify rent control in order to promote a return to a more nearly normal basis.[5] The purpose of rent control legislation has always been to stabilize rentals in emergency areas and under emergency conditions in order to prevent extortionate increases in rent resulting from housing shortages, and at the same time to allow landlords a fair and equitable return upon their investments. Foti v. Heller, 48 N.J. Super. 57, 137 A.2d 10 (N.J.App. 1957).
If the guidelines in our ordinance here were predicated on the criteria of the authorities mentioned above, such guidelines would probably meet with approval on the constitutional grounds raised. I am impelled by these precedents, however, to find that the standards and guidelines for the rent administrator are so fixed and arbitrary in this particular ordinance and in such exact percentages and amounts and terms as to prevent the administrator, even if he desired, from allowing a fair rate of return in certain situations which demanded it in order to avoid being confiscatory. This remains the result despite an attempt in other language of the ordinance to allow the administrator leeway in specified instances. Perhaps the city council has been overly conscientious in its efforts to spell out everything but in so doing it has run afoul of the buoys in the constitutional channel.
The various guidelines and standards have been closely evaluated to bring them into harmony with constitutional requirements but I am simply unable to do so, short of a virtual judicial rewrite of these provisions of the ordinance. This we are not authorized to do within our judicial limitations.
For example, a "freeze" date is set as of October 1, 1973, and despite limited authorizations in specified cases for some latitude to be granted, these provisions remain so restrictive that the continuing spiraling costs since that date, of which we must *769 take judicial notice, would preclude an administrator from allowing, even if he wanted, a rate of return that would be less than confiscatory at least in part. Needed in such an ordinance is a greater flexibility to take such matters into account so that the ultimate goals earlier expressed in the authorities of a fair rate of return and yet an avoidance of unfair rents would be more likely to be attained. They cannot be reached with provisions in the ordinance like Section 4(c)(4)(v) which allows an adjustment in rent where, "it is established that the earned income from the property does not result in a net annual return of 6% of the assessed evaluation of the property in effect as of October 1, 1973." The same provision then states:
"For the purposes of this paragraph, net annual return shall be the amount by which the earned income exceeds the operating expenses of the property, excluding mortgage interest, amortization, depreciation and debt service."
For one thing, the assessed valuation of property is not necessarily the proper basis for a fair return. Despite the requirement for 100% assessed valuation for purposes of taxation in Florida, this is not always current and such values do not coincide with the anniversary tax date. For example, the expert testimony in this cause is that in Miami Beach it approximates 75% of the fair market value on apartment buildings which would in reality compute out to a 4.5% return instead of the 6% provided, even if that should be found to be a fair return. Mortgage interest is expressly excluded as an operating expense and when this is calculated in the "return" it becomes a negative one of minus 4.25% under this provision of the ordinance. Obviously, this becomes confiscatory and the administrator is not allowed under these guidelines to make a sufficient adjustment to avoid confiscation and a deprivation of the landlord's property without due process of law.
Testimony revealed that each of the plaintiff corporations in this cause is operating at an actual loss before depreciation and yet under the ordinance's formula it had a "profit" and a "rate of return" of 10.46%. The expert observed that in order to qualify for an "increase" under the ordinance's formula, the owner would have to increase his losses to $183,000! As to the fair market value in relation to the assessment, the testimony reflected the value of one large apartment unit at $7 million which had been its purchase price in 1971 and yet its assessed value during the interim of increasing property values never did exceed $5 million; that competition had kept its rental increases during the 3-year period to an average of less than 5% and with an overall loss of $36,000 in the first 11 months of 1973, meaning, again, that to qualify for rent increase under the formula in the ordinance would require an increased loss up to $150,000 before an "increase" could be granted. These results simply do not square with the requirements of due process; they would constitute confiscation beyond the control of the Administrator under the tools he is given to work with. The council will simply have to try again.
The ordinance is unconstitutional in its present form, in my view, in that its provisions and guidelines are arbitrary and unreasonable and would be confiscatory and a denial of due process.
Having found the ordinance to be deficient for these reasons, the other grounds asserted as invalidating the ordinance need not be considered.
Accordingly, I concur in the majority opinion of the Court for the reasons set forth herein.
OVERTON, J., concurs.
OVERTON, Justice (concurring specially).
I agree that Section 166.021, Florida Statutes, is constitutional and that the City of Miami Beach has the constitutional *770 authority to enact a rent control ordinance upon a finding that an emergency exists.
The finding of the trial judge that the city council properly determined that an emergency does exist, because of "the extraordinary, unusual and unique factual situation existing in the south beach area" of Miami Beach, is proper.
The ordinance adopted by the City is deficient in that it lacks proper standards and guidelines for its enforcement. The opinion by Mr. Justice Dekle sets forth with particularity many of its deficiencies, which in effect make it confiscatory. I am concerned that the holding that certain standards and guidelines are so fixed as to make the ordinance confiscatory raises an inference that this situation could be corrected by giving the administrator even broader discretionary authority. It would be clearly improper to delegate broad discretionary powers to the administrator, although he could be authorized to promulgate rules and regulations that relate to the implementation of the act and are strictly procedural in nature. The correction must be in the standards and guidelines.
I concur with the majority judgment entered herein.
ROBERTS, Justice (concurring in part, dissenting in part):
I concur with the majority's holding that Sections 4(b)(1), 4(b)(4), and 9 of the questioned ordinance constitute City of Miami Beach v. Forte Towers, Inc. an unlawful delegation of legislative powers without sufficient objective guidelines, and, therefore, render the ordinance invalid. For emphasis, we restate the following excerpt from City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801 (Fla. 1972):
"The same restrictions which apply to the Legislature's delegation of legislative authority also apply to the enactment of municipal ordinances under the general police power by municipalities in that city ordinances must not constitute an improper delegation of legislative, executive or administrative power. Blitch v. City of Ocala, 142 Fla. 612, 195 So. 406 (1940). It has been previously held by this Court in Smith v. Portante, 212 So.2d 298, 299 (Fla. 1968), that:
"`No matter how laudable a piece of legislation may be in the minds of its sponsors, objective guidelines and standards should appear expressly in the act or be within the realm of reasonable inference from the language of the act where a delegation of power is involved and especially so where the legislation contemplates a delegation of power to intrude into the privacy of citizens.' (italics added).
"The rent control Ordinance at issue in the instant case does not contain objective guidelines and standards for its enforcement by the City Rent Agency nor can such be reasonably inferred from the language of the Ordinance.
"Unrestricted discretion in the application of a law without appropriate guidelines and determining its meaning may not be delegated by the City Council to an agency or to one person. (cases cited)"
However, rent control is a drastic measure to be utilized with the greatest caution and only in extreme situations. As the Court previously stated in Fleetwood, supra, in the area of rent control legislation in general, the Supreme Court of the United States has placed severe limitations on the power of state and municipal governments. When such legislation is enacted, deprivation of rights under the Fifth and Fourteenth Amendments to the Constitution and Section 9 of Article I, the Declaration of Rights of the Constitution of *771 Florida, and freedom to contract are endangered. In Fleetwood, supra, this Court further explicated:
"The only justification for the utilization of such legislation found by the U.S. Supreme Court is an emergency. Marcus Brown Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921), Lincoln Building Association v. Barr, 1 N.Y.2d 413, 153 N.Y.S.2d 633, 135 N.E.2d 801. Appeal dismissed 355 U.S. 12, 78 S.Ct. 12, 2 L.Ed.2d 20. Emergency has been narrowly defined. An increase in the cost of living (an inflationary spiral) alone is not a justification for rent control legislation which limits the amount of rent which a tenant may be required to pay. Chastleton Corporation, et al. v. Sinclair, et al., 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924). Explicitly designating the type of emergency which would be a viable basis for such legislation, the United States Supreme Court has held in Levy Leasing Co. v. Siegel, 258 U.S. 242, at 245, 42 S.Ct. 289, at 290, 66 L.Ed. 595.
"`The warrant for this legislative resort to the police power was the conviction on the part of the state legislators that there existed in the larger cities of the state a social emergency, caused by an insufficient supply of dwelling houses and apartments, so grave that it constituted a serious menace to the health, morality, comfort, and even to the peace of a large part of the people of the state. That such an emergency, if it really existed, would sustain a resort, otherwise valid, to the police power for the purpose of dealing with it cannot be doubted, for unless relieved, the public welfare would suffer in respects which constitute the primary and undisputed, as well as the most usual basis and justification for the exercise of that power.'" (emphasis supplied)
As explained by Bernard Frielander and Anthony Curreri in their treatise on Rent Control, which was published in 1948, shortly after the close of World War II, rent control arose as a war-time government control because of the grave situation in housing posed by both the First and Second World War. In their forward to their treatise, the authors explained:
"The origin of the conditions of which these controls are an outgrowth may be traced back almost twenty years to the beginning of the depression. When that economic cataclysm engulfed the nation, construction of new homes and business buildings dwindled to insignificant proportions. Before the building industry could show signs of revival, we were at war, and a virtual moratorium on construction was imposed. The cessation of hostilities has been followed by an upsurge of new construction, but soaring costs and other factors have seriously retarded the creation of additional residential accommodations and business space. During the entire period while construction lagged behind the nation's requirements, the population grew steadily. Both factors combined to produce a large deficit in housing facilities of which we became acutely aware when millions of veterans returned from the war and sought to establish homes for their existing or newly founded families.
* * * * * *
"The American people dislike government regulation of their business affairs and tolerate it only when they believe it to be justified by compelling considerations of public good. Accordingly, there is general agreement that the landlord-tenant relationship should be freed from rent controls at all government levels at the earliest time consistent with the public welfare."
The mere inability by a group of tenants to meet rent payments is not such an emergency as to justify government controls which are suitable to that group of tenants but which would render investments in housing projects far less attractive and in *772 some instances lead to bankruptcy. The right to invest capital and expect it to earn a fair return is a basic civil right and one which should not be destroyed merely for the convenience of tenants who are living in accommodations apparently beyond their financial ability. I do not believe that such an emergency as would warrant the questioned rent control ordinance existed in the instant cause. The shortage of housing units throughout this nation and particularly in Florida today is a matter of grave concern to all our people and certainly one which commands the attention and consideration of all responsible echelons of government. It is also a great challenge to the free enterprise system. Nevertheless, the housing crisis which we have allowed to creep upon us is not good and sufficient reason to confiscate the profits from investments in housing units which have been made in good faith. Unless government is to assume the total responsibility for low cost housing, private investors should be encouraged and not discouraged in making investments in additional housing units.
BOYD, J., concurs.
ERVIN, Justice (concurring in part and dissenting in part):
I concur in all of the opinion insofar as it upholds Ch. 73-129, but emphatically dissent to the remainder of the opinion striking down the City of Miami Beach's rent control ordinance. I find no rational basis in the majority opinion for now invalidating the ordinance. I perceive nothing in the ordinance itself which is contrary to Ch. 73-129 or to the Constitution, or to City of Miami Beach v. Fleetwood Hotel, Inc., Fla. 1972, 261 So.2d 801. The majority view is all quite puzzling to me in view of the aftermath of City of Miami Beach v. Fleetwood Hotel, Inc., and all that has been done by the Legislature and the City of Miami Beach to comply with the guidelines implicit in that decision.
It does not appear that the ordinance is substantially different from rent control ordinances or legislation enacted in other jurisdictions. See citations of cases upholding same in the dissent in the Fleetwood Hotel case, 261 So.2d, text 808.
The majority misconceives the import and impact of such provisions in the ordinance that relate to "net annual return," "assessed evaluation of property," and "operating expenses of the property," by contending they are universally confiscatory ab initio. On the contrary, all operating expenses of a rental property except debt service and depreciation are to be computed in the rental rates before a net annual return of 6 per cent is calculated on the assessed evaluation of the rental property. Taxes payable on a rental property are to be figured as operational costs. Rents are to be adjusted from time to time in keeping with the assessed valuation of the rental property at the rate of 6 per cent per annum of such valuation over and above said operating expenses. Even if return by the taxpayer can bring a property up to 100 per cent valuation against which the 6 per cent rate will be applied. Debt service requirements will vary among rental properties. To draw a flat conclusion that the rate will universally be 4.5 per cent as to all rental property and confiscatory is logically insupportable. There are further provisions in the ordinance which permit the administrator reasonable latitude to relieve particular landlords in hardship situations and, of course, court review affording due process against confiscation is stipulated.
Since the beginning date of operation of the ordinance and its freeze of rents on October 1, 1973 were rendered inoperative by the present litigation, it will be necessary that the beginning operational date of rent control be judicially readjusted in keeping with the intendment of the ordinance.
It is hardly judicial to conclude blanketly that confiscation will ensue as to all rental *773 properties in advance of any conclusive evidentiary demonstration to that effect as to any rental property or properties pursuant to an administrative hearing or court review.
ADKINS, C.J., and McCAIN, J., concur.
NOTES
[1] Contrary to appellee's assertion, this statute is not "a mere delegation of the police power," which would not carry with it the power to enact rent control ordinances.
[2] Tornillo v. Miami Herald Publishing Co., 287 So.2d 78 (Fla. 1973); State ex rel. Shevin v. Metz Construction Co., 285 So.2d 598 (Fla. 1973); City of St. Petersburg v. Siebold, 48 So.2d 291 (Fla. 1950); Florida Sugar Distributors v. Wood, 135 Fla. 126, 184 So. 641 (1938).
[3] Id.
[4] Nebbia v. People of State of New York, 291 U.S. 502, 539, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 79 L.Ed. 949 (1935); Rivera v. R. Cobian Chinea & Co., 181 F.2d 974, 978 (1st Cir.1950); Mora v. Mejias, 223 F.2d 814, 816 (1st Cir.1955); Kress, Dunlap & Lane, Ltd. v. Downing, 193 F. Supp. 874 (D.V.I. 1961).
[5] Russell v. Treasurer & Receiver General, 331 Mass. 501, 509, 120 N.E.2d 388 (1954); Nayor v. Rent Board of Town of Brookline, 334 Mass. 132, 134 N.E.2d 419 (S.Jud.Ct. 1956).